UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CHANEL JACKSON,                    )
                                   )
            Plaintiff              )
                                   )
      v.                           )  Case No. 2:04 cv 299
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security    )
                                   )
            Defendant              )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Chanel Jackson, on November 29, 2004. For the reasons set forth below, the motion is **DENIED**.

Background

The plaintiff, Chanel Jackson, filed for Child's Disability Insurance Benefits on April 6, 2001, on the account of her deceased mother, Jervae Holt. (Tr. 17, 176-78) The claim was denied initially on August 2, 2001 and upon reconsideration on January 3, 2002. (Tr. 115-16) Jackson requested a hearing before an Administrative Law Judge ("ALJ") on January 30, 2002, and a hearing was held before ALJ William Wilkin on September 26, 2002. (Tr. 26-35, 134) ALJ Wilkin remanded Jackson's case back to the agency for further evaluation of Jackson's alleged mental defects, which were not addressed in the record but which Jackson claimed for the first time at the ALJ hearing. (Tr. 119) On January 16, 2003, the agency denied Jackson's claim on remand. (Tr. 123-24) Subsequently, ALJ Wilkin conducted a second hearing on September 4, 2003, during which Jackson, her father Roosevelt

Jackson, and Vocational Expert ("VE") Thomas Grzesnik, testified. (Tr. 36-114) Following this hearing, ALJ Wilkin denied Jackson's application by written decision dated November 26, 2003. (Tr. 17-25) After the Appeals Council declined Jackson's request for review on May 28, 2004, Jackson filed a complaint in this court on August 3, 2004. (Tr. 6-12)

Jackson was born on June 29, 1983 in Gary, Indiana and has suffered from cerebral palsy since infancy. (Tr. 43, 96, 244) She is unmarried and has a son who was born on June 8, 2000. (Tr. 44, 93) Jackson has either a 9th or 10th grade education and testified at the ALJ hearing that she got "kicked out" of high school for fighting but later stated that she dropped out. (Tr. 45-46, 101) She subsequently obtained her GED and attended college classes two days a week for one quarter of the school year at the International Academy of Design Technology in Chicago before voluntarily withdrawing. (Tr. 46, 277) She also worked for a total of five months for a telemarketing firm, Americall, from September to November 1999, August to September 2000, and June to August 2002, for which she received "Average" to "Good" performance ratings and a statement that she would be rehired. (Tr. 217, 228) Jackson testified that she quit this job three times because Americall threatened to fire her for her fast speech and that if she was fired, she could not return. (Tr. 148-49) However, Americall reported that Jackson quit because of school conflicts. (Tr. 228) At the time of the hearing, Jackson and her son were living with a friend. (Tr. 66)

2

Jackson began going to Shriners Hospital for Children on October 27, 1998, where she was diagnosed with right hemiparateic athetoid cerebral palsy. (Tr. 287) Dr. Renato Bosita noted that Jackson's right hand was "held in palmarflexion of approximately 40 degrees and also pronation of about 75 degrees" with flexed fingers and that her right foot had "claw toes" and was flat. (Tr. 287-88) X-rays confirmed a planovalgus deformity in Jackson's right foot and that her right thumb was adducted with a hyperextended interphalageal joint, and a neurological exam showed spasticity with hyperreflexia on Jackson's right side. (Tr. 288-89) However, at the time of examination, Jackson was in the 9th grade and able to "ambulate fully and play sports with no assistive aids." (Tr. 287) Her legs were equal in length and she walked "with a reciprocal heel-to-toe gait," although her right foot was externally rotated with planovalgus alignment. (Tr. 288) In a follow-up visit on October 29, 1998, OTR/L Leah Fallgatter stated that Jackson was independent in her activities of daily living, but she fitted Jackson with a soft wrist splint to place her right arm in a more neutral position and assist her in day to day use of her right hand. (Tr. 286) Jackson returned to Shriner's Hospital on march 19, 1999, where Drs. Terry Light and Peter Smith recommended Botox injections for Jackson's right arm. (Tr. 285).

On October 7, 1999, school psychologist Carolyn Hall examined Jackson after she was referred by her teacher due to disruptive classroom behavior. (Tr. 244) The report notes that Jackson

3

was dealing with grief issues due to the deaths of her mother and grandmother, was suffering from cerebral palsy and occasional migraine headaches, had anger management problems, and had trouble dealing with authority figures. (Tr. 244) However, she presented herself to Dr. Hall as "very friendly, pleasant, and seemed to really enjoy the one-on-one aspect of assessment." (Tr. 244) Dr. Hall also stated that Jackson would not easily give up and persisted to the limit of her abilities on the tests Dr. Hall conducted. (Tr. 244)

During her examination of Jackson, Dr. Hall administered the Wechsler Intelligence Scale for Children, the Kaufman Test of Educational Achievement, and the Devereux Behavioral Rating Scale. (Tr. 245) On the Wechsler test, Jackson scored 83 on the verbal scale; 83 on the performance scale; and 82 on the full scale, representing a low average range of intelligence. (Tr. 245) Jackson scored on levels from 3rd grade to middle 6th grade on the Kaufman Test, which tested reading, spelling, and math skills. (Tr. 246) In addition, Jackson's performance on the Devereux scale was classified as "Very Significant" in interpersonal problems, inappropriate behaviors/feelings, depression, and physical symptoms/fears. (Tr. 246) Dr. Hall stated that Jackson's overall "very significant" rating on the Devereux test indicated "that a determination of serious emotional disturbance would be possible when all the assessment information was considered." (Tr. 246) Consequently, Hall recommended a more compre-

4

hensive evaluation and called for a case conference to determine
what services could benefit Jackson.  (Tr. 247)

In a Disability Report dated April 9, 2001, Jackson de-
scribed her disability as paralysis on the right side which made
her "unable to hold on grip."  (Tr. 194) An undated and unsigned
Disability Report from the field office, presumably completed by
a disability reviewer after Jackson filed for benefits, stated
that Jackson was observed to have problems standing, walking, and
using her hands.  (Tr. 191) In a reconsideration disability
report filed January 2, 2001, Jackson expanded on these limita-
tions in stating that she had bad muscle spasms in her right arm
and leg, could not use her right hand, and drove with her left
foot.  (Tr. 203-05) She further stated that she had migraine
headaches if she was "in any heat."  (Tr. 203) In a subsequent
reconsideration report dated September 3, 2001, Jackson further
stated that she had scoliosis, could not pay her bills, and could
not find work.  (Tr. 210-12)

On May 5, 2001, Jackson completed a Daily Activities Report
in which she stated that she cooked, drove, did laundry, and
cleaned her house on a daily basis, and that she sometimes had
problems cooking because her right hand would turn over what she
was cooking.  (Tr. 207) She further stated that she always needed
help putting lotions on her right arm, but said that she did not
have problems getting along with friends, acquaintances, rela-
tives, or coworkers at her last job.  (Tr. 208)

On July 5, 2001, Dr. A. Khan examined Jackson for the Disability Determination Bureau. (Tr. 233-34) In describing the history of her disability, Dr. Khan noted that Jackson "cannot pick up things with the right hand. She has spasms in the right hand. She walks with a limp due to right leg problems." (Tr. 233) Upon examination, Dr. Khan found that Jackson had a limping gait and was unable to walk on her toes but that she could get on and off the exam table without difficulty. (Tr. 233) He also found that she had contracture deformity in her right hand and right foot, was unable to extend fully the fingers on her right hand, and experienced periodic tonic contractions. (Tr. 234)

On August 2, 2001, Dr. F. Gonzales completed a Physical Residual Functional Capacity Assessment ("RFC") for the Disability Determination Bureau. (Tr. 236-43) Dr. Gonzales found that Jackson could lift 20 pounds occasionally and 10 pounds frequently, as well as stand and/or walk for 2 hours and sit for 6 hours in an 8-hour work day. (Tr. 237) Jackson also could climb, balance, stoop, kneel, crouch, or crawl on occasion, but she had to avoid even moderate exposure to heights. (Tr. 238, 240) In support of these conclusions, Dr. Gonzales noted that Jackson had contracture deformity in both right extremities with a limping gait but that she had full range of motion in all joints, her fine fingering was intact, her strength was 5/5, and a neurological exam was within normal limits. (Tr. 237)

On December 4, 2001, Jackson visited Shriner's Hospital for a third time, where OTR/L Fallgatter fitted Jackson for a Benik

glove and encouraged her to "resume stretching her hand and
elbow." (Tr. 284) She did not return until February 5, 2002,
when she reported increased pain in her right arm. (Tr. 282) In
addition to her physical ailments, Jackson also recounted a
history of throbbing periorbital headaches, which she called
migraines, and which were "relieved immediately with Aleve."
(Tr. 282) Upon examination, Dr. Kenneth Silver reported that
Jackson appeared to be an "alert, attentive, cooperative woman"
with a stiffly extended right arm, flexed right wrist and fingers
with spasticity, and a "mild right hemiplegic gait with the right
foot flat and valgus." (Tr. 282) In agreement with Dr. Silver,
Dr. Smith prescribed Botox injections for Jackson's arm. (Tr.
281-83) He also noted that she had been prescribed a brace for
her foot. (Tr. 281)

　　　　Seven months later, on September 10, 2002, Jackson returned
to Shriner's Hospital complaining of shoulder, elbow, and arm
pain which kept her from falling asleep and bothered her with
overhead activities and while sitting still. (Tr. 280) Dr. Smith
noted that Jackson had not received the Botox injections because
of a fever the night before surgery and that she had not resched-
uled the injections. (Tr. 279) Upon examination, he found that
Jackson had pain with forward elevation and adduction, as well as
tenderness along the biceps tendon. He concluded that she likely
had an impingement and inflammation of that tendon, for which he
prescribed Motrin therapy and exercises. (Tr. 279) OTR/L Leah
Bent gave Jackson a home exercise routine and fabricated a right

wrist cockup splint because Jackson complained that her soft
Benik splint was not working.  However, Bent noted that Jackson
tended to pop out of the new splint and that if it did not work,
they would need to revisit soft splinting options.  (Tr. 280) On
December 2, 2002, Dr. Peter Smith reported that Jackson would
have Botox injections that week, but Jackson did not have them
until March 11, 2003, over one year after the injections were
prescribed.  (Tr. 278)

On October 24, 2002, Jackson completed a second Daily
Activities Report in which she reported the same activities as in
her May 5, 2001 report, but she elaborated that she cleaned one
room per day and that cleaning and lifting a laundry basket
caused her back to hurt.  (Tr. 225) She said that people com-
plained that she did not do these activities fast enough, to
which she would not respond because they did not understand, but
that she got along with everyone except people at her last job
who complained about her speech.  (Tr. 226) She also stated that
she went to school.  (Tr. 226)

On December 30, 2002, Clinical Psychologist Roger Parks
interviewed Jackson and administered the Wechsler Adult Intelli-
gence Scale-Third Edition (WAIS-III) to her.  (Tr. 248) During
the course of the interview, Dr. Parks observed that Jackson
walked with a limp and could not use her right hand.  (Tr. 249)
Jackson confirmed that she had a useless right hand and weak
right leg, and she further stated that she experienced constant
back pain and was depressed and tearful, with daily crying

spells, following several deaths in her family.  (Tr. 248, 249)
She also stated that she had low energy levels with a fluctuating
appetite but that she had gained 50 pounds in the past year.
(Tr. 248) Jackson reported to Dr. Parks that she was "able to
keep pace with assignments" at design school, although she
admitted to losing focus in classes which did not interest her.
(Tr. 248-49) She also reported working 25 hours a week at Ameri-
call until she quit to attend college, and she stated that she
was "written up" at Americall for "talking too fast" when speak-
ing.  (Tr. 249) At the time of the interview, Jackson lived by
herself, did most of her own chores, and took care of her then
two year old son.  (Tr. 249) She occasionally hired someone to
clean and cook when in pain.  (Tr. 249) She stated that she was
able to maintain her appearance and hygiene adequately with one
hand.  (Tr. 249)

Dr. Parks observed that Jackson was "generally cooperative,
although she did express some mild irritability and frustration
over not being able to yet obtain disability." (Tr. 249) Never-
theless, Dr. Parks found that Jackson had rational, coherent
thought processes, fast but comprehensible speech, was attentive
and cooperative throughout testing, and "persevered on more
difficult test items and did not display any frustration regard-
ing her performance."  (Tr. 249)

On the WAIS-III, Jackson scored a full scale score of 85
with a verbal score of 81 and performance score of 91, which
placed her within the low average range of intelligence.  (Tr.

9

249) He also diagnosed her with "Adjustment Disorder with Depres-
sed Mood" based upon Dr. Parks' observations and Jackson's own
descriptions of being depressed and tearful and having decreased
energy, poor concentration, and insomnia. (Tr. 249) However, Dr.
Parks concluded that Jackson did not exhibit symptoms severe
enough to warrant a diagnosis of Major Depression. (Tr. 249)

On January 14, 2003, psychologist J. Gange completed a
Psychiatric Review Technique of Jackson for the Disability
Determination Bureau. (Tr. 255-70) He found that while Jackson
suffered from an adjustment disorder, her mental impairment was
not severe. (Tr. 255, 258) He also found that the evidence
indicated that Jackson had no restriction in her activities of
daily living or any episodes of decompensation, and only mild
limitations on social functioning and in maintaining concentra-
tion, persistence, or pace. (Tr. 265)

On March 11, 2003, Jackson received Botox injections in her
right arm and hand at Shriner's Hospital. (Tr. 277) During her
follow-up appointment on April 1, 2003, Dr. Smith noted that the
Botox had improved the adduction in Jackson's right thumb but
that she still was unable to use it. (Tr. 275) Her right wrist
was straight, but her fingers still were contracted, although Dr.
Smith was able to manually extend them completely. (Tr. 275) She
also complained of right shoulder pain for which Dr. Smith
recommended cortisone and lidocaine injections. (Tr. 275)
Because Jackson refused the injections, Dr. Smith recommended
continued physical therapy. (Tr. 275)

10

Upon seeing Physical Therapist Joseph Krzak that day, Jackson complained of back pain which she described at a level of 1/10 and increased to 9/10 with prolonged sitting, standing, walking, or lying down. (Tr. 276) However, she did not report a pain level exceeding 2/10 in any of the tests PT Krzak administered. (Tr. 276) PT Krzak recommended water exercises, abdominal stabilization exercises, and occupational therapy for Jackson's right shoulder, and referred her to a dietician to address her eating habits. (Tr. 276)

During the ALJ hearing on September 4, 2003, Jackson testified that her left side was normal, but that her right side developed more severe palsy symptoms around 2001, and that she currently was experiencing pain and spasming in both her right arm and leg. (Tr. 50-52) Jackson described difficulty walking because her right foot was flat with toes curled under, and she said that she had back pain primarily on her right side. (Tr. 52) In addition, she stated that she experienced one or two "migraines" per week which were caused by heat or "scents" and which normally were relieved by taking Aleve. (Tr. 53) She stated that although the Botox injections returned her arm to a more comfortable position, the effects wore off within a few weeks. (Tr. 56) She testified that she could stand or sit for about 15 minutes before her back started to hurt, that she could drive with her left foot, walk one block, and lift a bag of potatoes or gallon of milk with her left hand. (Tr. 59, 63-64) She stated that she did not have problems going up and down the

11

stairs in the apartment where she currently was living unless she was experiencing back pain. (Tr. 69) She further stated that she was the primary caregiver for her son but that she would pay neighborhood children to help her clean, do dishes, and wash laundry. (Tr. 58, 85-86) She would cook when no one was available to do so or would go to her father's house to eat. (Tr. 60) She slept, on average, 6.5 hours per night. (Tr. 91)

Jackson testified that she "had problems from kindergarten on up" with other children, her teachers, and her own behavior. (Tr. 74) She stated that the teachers "lied on [her]" by accusing her of misbehaving when she had done nothing wrong, and that kids would make her angry by teasing her about her condition. (Tr. 79) She said that she was suspended from school two or three times and stated that she had "associates" rather than friends in school because people would try to use her. (Tr. 73-75) Jackson testified that in middle school she participated in a counseling program mainly aimed at foster children to address her "Anger, emotions . . . Depression, all type of stuff." (Tr. 77) At the time of the hearing, Jackson reported that she cried every day because of the murder of her brother and the death of her mother. (Tr. 93)

Following Jackson's testimony, her father, Roosevelt Jackson, testified that Jackson had a lot of problems with other children bothering with her and trying to take advantage of her in school. (Tr. 97) He stated that teachers reported Jackson having a high temper and that she would fight. (Tr. 98) He said

that although the school suggested special education, the family
did not want to put her in that program because they wanted to
keep her with the other kids.  (Tr. 99-100) He also testified
that she was asked to leave two Catholic schools due to her
"temper."  (Tr. 98) He further stated that Jackson lived with him
until she was 16 and at that time would have difficulty complet-
ing chores around the house that she started.  (Tr. 105-06)

Finally, ALJ Wilkin posed a series of hypotheticals to VE
Thomas Grzesik.  In response to a hypothetical for a 19 year old
with a 9th grade education and a light work function, but who
cannot use her right arm, Grzesik testified that Jackson could
perform her previous telemarketing job, or alternatively, appro-
ximately 24,000 jobs in retail sales; 6,500 as a cashier; and
4,000 as an order clerk.  (Tr. 108-10) In a second hypothetical
for sedentary light work with the same restrictions, Grzesik
testified that Jackson could perform her telemarketing job as
well as 3,500 cashier, 3,500 telephone surveyor, and 3,000 order
clerk jobs.  (Tr. 110) In a third hypothetical for a worker who
could not sustain light or sedentary work on an 8-hour basis, all
jobs were precluded.  (Tr. 111) VE Grzesik also testified that
all jobs would be eliminated if, in hypothetical four, Jackson
could perform only light or sedentary work that required low
degrees of concentration and a simple one-two step process.  (Tr.
111) On cross-examination, the VE testified that if Jackson was
limited to light work but had difficulties interacting with

13

people, managing anger, or being disruptive, no jobs would be available. (Tr. 113)

In his decision denying benefits, ALJ Wilkin clarified that Jackson sought disability on the basis of "right-sided cerebral palsy, back pain, neck pain, headaches, shortness of breath, and behavioral problems." (Tr. 18) At Step One, the ALJ found that Jackson's previous telemarketing experience did not qualify as substantial gainful activity. (Tr. 19) Proceeding to Step Two, ALJ Wilkin found that Jackson had severe impairments consisting of "cerebral palsy affecting the right upper extremity, and a right planovalgus foot." (Tr. 21) In reaching this conclusion, the ALJ considered that she previously had undergone surgery to lengthen the right heelcord but that she still had a planovalgus foot with spasticity. (Tr. 19) He also noted that as of 1998, Jackson had a 40 degree palmarflexion and 75 degree pronation in her right wrist but was not receiving therapy and had a normal range of motion in her arm. (Tr. 19) Per her own statements, she could ambulate fully, play sports, and was independent in her activities of daily living. (Tr. 19)

ALJ Wilkin further detailed the progression of her treatment at Shriner's Hospital including her reports to Dr. Kahn and his observations that she had a limping gait but was able to get on and off the examination table without difficulty, had a full range of motion, 5/5 muscle strength and tone, and "good fine finger manipulative abilities" in July 2001. (Tr. 20) The ALJ considered the Shriner's records in full from each of Jackson's

14

subsequent visits, including her delayed pursuit of the Botox injections, her fittings with a soft Benik glove and hard wrist splint, her complaints of headaches and back pain, and the reports of Dr. Smith and PT Krzak regarding future treatment. (Tr. 20-21)

Turning to the evidence of Jackson's non-physical impairments, ALJ Wilkin recounted the conclusions and observations of school psychologist Hall in her 1999 report, including Jackson's placement in the range of low average intellectual functioning on the WISC-III test.  (Tr. 19) ALJ Wilkin further noted that although Dr. Hall's report mentioned "numerous anecdotal records" of Jackson's problematic behavior, none of these records were related in Jackson's disability record and Dr. Hall described Jackson as "very friendly and pleasant during testing."  (Tr. 19) He emphasized that Dr. Hall had found only "the potential risk of a serious emotional problem in conjunction with a conduct problem."  (Tr. 19) (emphasis in original) Similarly, he noted that Dr. Parks had diagnosed Jackson with "an adjustment disorder with depressed mood," rather than Major Depression, following his interview and testing of Jackson in 2002.  (Tr. 20-21) ALJ Wilkin reviewed Jackson's descriptions of her symptoms to Dr. Parks in full and noted that Dr. Parks found her to be cooperative during testing.  (Tr. 20-21) Based on this evidence, the ALJ concluded that Jackson's cerebral palsy was "severe."  (Tr. 21)

However, at Step Three, ALJ Wilkin concluded that Jackson's impairments did not meet or equal the criteria for the Cerebral

15

Palsy Listing, 11.07.  (Tr. 21) In support of this conclusion,
the ALJ explained that Jackson's IQ was over 70 and that her
palsy was limited to one extremity.  He found that Jackson's back
pain, which was reported to PT Krzak for the first time in 2003,
was not severe because Krzak only could reproduce the pain at a
level of 2/10, and Jackson "had negative Spurling sign and
negative slump test at the time."  (Tr. 21) ALJ Wilkin further
noted that "there are only scattered references to headache pain,
and no mention whatsoever of neck pain or shortness of breath, in
the written record."  (Tr. 21) Finally, the ALJ noted the absence
of any written evidence to corroborate the testimony regarding
Jackson's behavioral or anger-management problems in school.
(Tr. 22) He reviewed both Dr. Hall and Dr. Parks' statements that
Jackson was friendly, pleasant, and cooperative throughout their
evaluations, that she appeared to be a "rather nice person" on
the day of the hearing, that she worked as a telemarketer which
required "good interpersonal skills," and that she was studying
design two days a week and keeping up with her assignments.  (Tr.
22) For these reasons, ALJ Wilkin found that Jackson's adjustment
disorder was not severe.  (Tr. 22)

     At Step Four, ALJ Wilkin found that Jackson had the RFC to
perform a wide range of light work.  (Tr. 23) Specifically, the
ALJ stated that she could "lift/carry 10 pounds frequently and 20
pounds occasionally, and [could] sit, stand and/or walk at least
6 hours each during an 8-hour day," although she could not use
her right arm.  (Tr. 23) In so finding, the ALJ determined that

16

Jackson was credible only to the extent of her testimony that she could not use her right arm. (Tr. 22) He rejected her claim that she could sit for only 15 minutes as inconsistent with other testimony that she recently had driven 50 miles in one sitting, concluded that the effectiveness of Aleve for Jackson's headaches indicated that they were not as severe or persistent as she claimed, and noted that she never sought treatment for her back pain nor mentioned it to her treating physician, Dr. Smith. Rather, in 2003 she told PT Krzak, who could replicate the pain only at 2/10. (Tr. 23) He also reiterated that she consistently had been described as pleasant and cooperative and that Americall said she was an average to good telemarketer and would be rehired if she applied. (Tr. 23) Nevertheless, he found that her Americall experience fell short of substantial gainful activity, and so she had no past relevant work at Step Four.

At Step Five, he adopted the limitations of the first hypothetical he posed to VE Grzesik, finding that Jackson could perform 24,000 jobs in retain sales, 5,500 jobs as a cashier, and 4,000 jobs as an order clerk.[1]  (Tr. 24)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Secu-rity Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g)  ("The

---

[1] VE Grzesik testified that 6,500 cashier jobs were available, rather than the 5,500 stated by the ALJ.  The difference, though, is insignificant given that the total number exceeds 33,000 jobs regardless.

findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* **Consolidated Edison Company v. NLRB,** 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* <u>**Sims v. Barnhart**</u>, 309 F.3d 424, 428 (7th Cir. 2002); **Green v. Shalala,** 51 F.3d 96, 101 (7th Cir. 1995).  An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 322 F.3d at 915; **Cannon v. Apfel,** 213 F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ß423(d)(1)(A). The Social Secu-

18

rity regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.   20 C.F.R. ßß404.1520, 416.920.   The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ßß404.1520(b), 416.920(b).   If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. ßß404.1520(c), 416.920(c).   Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.   20 C.F.R. ß 401, pt. 404, subpt. P, app. 1.   If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.   However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.   If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. ßß 404.1520(e), 416.920(e).   However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national

economy.  42 U.S.C. ß423(d)(2); 20 C.F.R. ßß404.1520(f),
416.920(f).

Jackson's first argument in support of remand is that the
ALJ failed to address whether Jackson exhibited "abnormal behav-
ior patterns" when considering whether Jackson met Listing 11.07
for Cerebral Palsy.  More specifically, she argues that the ALJ's
decision was "perfunctory" because he failed specifically to
mention this factor under 11.07B.[2]

In order to be found disabled pursuant to Listing 11.07 at
Step Three, a claimant must have both Cerebral Palsy and "A. IQ
of 70 or less; or B. Abnormal behavior patterns, such as destruc-
tiveness or emotional instability; or C. Significant interference
in communication due to speech, hearing, or visual defect; or D.
Disorganization of motor function as described in 11.04B."  20
C.F.R. Part 404, Subpart P, Appendix 1, Part A 11.07.  Thus, the
claimant must demonstrate that she suffers from Cerebral Palsy as
well as one of the four medical findings listed.  *See* 20 C.F.R.
ß404.1525(d) ("We will not consider your impairment to be one
listed in appendix 1 solely because it has the diagnosis of a
listed impairment.  It must also have the findings shown in the
Listing of that impairment.").  A claimant's impairment equals
listing "if the medical findings are at least equal in severity

---

[2]  Without supporting authority, Jackson also argues that while ALJ
Wilkin considered "her mental problems in regard to meeting the mental
listings . . . this discussion is not a substitute for a discussion of
11.07B."  (Pl. Opening Brief, pp. 14-15) This argument does not make sense
within the context of the ALJ's decision.  The only listing specifically cited
by ALJ Wilkin is 11.07, and the parts of his decision to which Jackson cites
in support of her argument fall at the end of the ALJ's consideration of that
Listing.

and duration to the listed findings."  20 C.F.R. ß404.1526(a).
The burden of proof is on the claimant to prove that her condi-
tion meets or equals a listed impairment.  20 C.F.R.
ß404.1512(c); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir.
2004).  To do so, the claimant must "satisfy all of the criteria
of the listed impairment.  *Maggard v. Apfel*, 167 F.3d 376, 380
(7th Cir. 1999).  *See also Anderson v. Sullivan*, 925 F.2d 220,
223 (7th Cir. 1991).

Although no court has defined the phrase "abnormal behavior
patterns," several principles guide the court's review of ALJ
Wilkin's decision.  First, judicial review is limited to ensuring
that no legal error has been committed and that the ALJ's "ulti-
mate conclusions are supported by substantial evidence."  *See,
e.g., Simpson v. Barnhart*, 91 Fed. Appx. 503, 507 (7th Cir.
2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) ("We
must sustain the findings of the ALJ so long as they are sup-
ported by substantial evidence."); *Diaz v. Chater*, 55 F.3d 300,
305 (7th Cir. 1995) (holding that substantial evidence means
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion") (internal quotations omitted).
Second, the court "may consider the entire administrative record,
but may not substitute our judgment for that of the ALJ by
reconsidering the facts, reweighing the evidence or resolving
factual disputes."  *Scott*, 297 F.3d at 593.  *See also Cannon v.
Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Maggard*, 167 F.3d at
378.  Third, in order to justify his position and facilitate the

court's review, the ALJ must adequately articulate his opinions.
*See, e.g.*, **Scott**, 297 F.3d at 596; **Diaz**, 55 F.3d at 307-08
(finding that the ALJ must articulate, at some minimum level, his
analysis of the evidence).  In other words, he must "build an
accurate and logical bridge from the evidence to [his] conclu-
sion." **Zurawski v. Halter**, 245 F.3d 881, 887 (7th Cir. 2001)
(*quoting* **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000)).

In her opening brief, Jackson seeks to have this court
reweigh the evidence by arguing that Jackson's performance on the
tests administered by Dr. Hall in 1999 conclusively reveals
social-emotional adjustment problems severe enough to preclude
job placement pursuant to a 1987 study.  *See* **Treating Cerebral
Palsy for Clinicians by Clinicians**, 71 (Eugene T. McDonald, ed.)
(1987); Pl. Opening Brief, pp. 13-14.  However, this article was
not part of the record considered by the ALJ.  Beyond the prob-
lems presented by reliance on a nearly 20-year-old text that
neither party attempts to classify as still relevant within its
field or accepted as an authoritative text by the courts or
Commissioner, this court declines to reevaluate the evidence on
behalf of the ALJ.

Moreover, the ALJ's detailed decision more than complies
with his duty to minimally articulate his reasons for finding
that Jackson did not meet the B criteria for Listing 11.07.  ALJ
Wilkin specifically addressed Jackson's alleged behavioral
problems and considered the records provided by Drs. Hall and
Parks in full.  (Tr. 19-21) Despite Jackson's contention that

22

"[t]here was a significant amount of evidence in the record
indicating that the Plaintiff had problems with emotional stabil-
ity," the ALJ correctly noted that "there is no written evidence
to corroborate any of these accounts." (Pl. Opening Brief p. 13)
(Tr. 21) In further support of his conclusion that Jackson did
not meet Listing 11.07, the ALJ noted that Dr. Hall's report only
cited a "<u>potential risk</u> of a serious emotional problem," that
Jackson did not describe a history of behavioral problems to Dr.
Parks in 2002, that she repeatedly was described as cooperative
and pleasant, that she was keeping up with her studies at Design
School, and that she appeared to be "rather nice" at the hearing.
(Tr. 22)

These conclusions are consistent with the record, which is
replete with examples of plaintiff's good demeanor and general
lack of destructiveness or emotional instability.  For example,
Dr. Parks described Jackson as "attentive and cooperative" and
stated that she "persevered" through the more difficult portions
of testing without showing frustration.  (Tr. 249) Dr. Hall also
described her as "very friendly" and "pleasant."  (Tr. 244) In
addition, Americall rated Jackson's telemarketing performance as
average to good and stated that she would be rehired.  (Tr. 228)
Given the record's numerous references to Jackson's pleasant
demeanor, the absence of written evidence to the contrary, and
ALJ Wilkin's careful consideration of the behavioral aspect of
Jackson's claim, this court cannot say that the ALJ did not

adequately articulate his position or that he reached a decision contrary to the substantial evidence.

Jackson's reliance on *Scott* is misplaced.  *See* 297 F.3d at 595.  The primary issue in *Scott* was whether the claimant met Listing 112.05 for mental retardation in a child.  297 F.3d at 594-95.  In reversing the ALJ, the Seventh Circuit found that "the ALJ did not discuss or even reference" Listing 112.05 and thus did not consider the case in light of that listing's analytical framework.  *Scott*, 297 F.3d at 595.  By contrast, ALJ Wilkin specifically referenced Listing 11.07 and discussed the A and D criteria for that Listing.  Although he did not cite the C criteria for "abnormal behavioral patterns" by name, the subsequent paragraph of the ALJ's decision specifically addressed "behavioral and/or anger-management problems" and contained a thorough explanation of why he did not find that Jackson's problems created a disability.  (Tr. 21-22) Thus, *Scott* is not controlling here.

On a related note, Jackson argues that the ALJ did not properly consider whether her impairments, when combined, equaled a listing.  *See* 20 C.F.R. ß416.923.  This argument also fails because even a cursory reading of the ALJ's decision reveals that he considered the claimant's alleged impairments in tandem.  In addition to ALJ Wilkin's numerous findings and conclusions outlined above, the ALJ considered Jackson's inability to use her right arm, her allegations of back pain and headaches, and her alleged behavioral problems in determining that Jackson still

retained an RFC for substantial gainful activity.  (Tr. 22-23)
The law is well-established that an ALJ need not parrot the
regulations with didactic precision.  The ALJ must only demon-
strate to the court that he "considered the evidence the law
requires him to consider.  A more extensive requirement sacri-
fices on the altar of perfectionism the claims of other people
stuck in the queue."  **_Stephens v. Heckler_**, 766 F.2d 284, 288 (7th
Cir. 1983).

Next, Jackson argues that the ALJ had a duty to obtain
Jackson's file pertaining to an earlier award of Child's Bene-
fits.  However, CIB before age 18 are not awarded upon a showing
of disability by the child.  _See_ 42 U.S.C. ß402(d)(1); 20 C.F.R.
ß404.350.  In any event, the claimant bears the burden of proving
a disability.  ALJ Wilkin remanded the case after the September
26, 2002 hearing so that more evidence could be gathered.  Then,
the ALJ kept the record open after the second hearing until
October 10, 2003 and granted two different extensions during
which time no new evidence was presented.  (Tr. 17) Thus, Jackson
had ample opportunity to supplement the record with other perti-
nent information.  She concedes these points by failing to defend
her position in her reply brief.

Jackson's last argument with respect to Listing 11.07 is
that ALJ Wilkin's decision is defective because he did not state
specifically that he relied upon the agency physicians' opinions
and because the agency physicians' reports are defective since
(1) none of these physicians specifically mentioned 11.07, (2)

25

one agency physician addressed only the physical and the other addressed only the mental, and (3) these physicians did not consider the testimony of Jackson's father.  First of all, Social Security ruling 96-6p states that "[t]he signature of a State agency medical or psychological consultant on [a] . . . Disability Determination and Transmittal Form ("DDTF") . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence. . . ."  SSR 96-6p, at *3.  A DDTF finding Jackson not disabled on the basis of either her cerebral palsy or affective disorders was signed by medical and psychological consultants in 2003.  (Tr. 123) Second, ALJ Wilkin specifically stated that he agreed with the state psychologist that Jackson's mental impairments were not severe.  (Tr. 22) Third, Jackson produced no legal support whatsoever, and the court is aware of none, for her contention that the agency physicians were required to consider her father's hearing testimony before completing their evaluations of her impairments.  For these reasons, Jackson's argument fails.

Finally, Jackson briefly argues that the ALJ improperly determined that she could do "Light Work" under 20 C.F.R. ß404.1567(b) due to a finding that she could "stand and/or walk at least 6 hours each during an 8-hour work day.  (Tr. 237) However, in her reply brief, she concedes that even at the sedentary level defined by Dr. Gonzales' RFC, she still could do

26

10,000 jobs.  Accordingly, the court finds that Jackson is not entitle to summary judgment on this argument.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Chanel Jackson, on November 29, 2004 is **DENIED**.

ENTERED this 1st day of September, 2005

s/ ANDREW P. RODOVICH
United States Magistrate Judge

27